**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jack PRIBBLE, Defendant–Appellant.**

No. 96–2584.

United States Court of Appeals,
Seventh Circuit.

Argued May 15, 1997.

Decided Oct. 6, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 6, 1997.

Hilary W. Frooman (argued), Office of the United States Attorney, Urbana Division, Urbana, IL, for Plaintiff–Appellee.

Nathan Z. Dershowitz (argued), Victoria B. Eiger, Dershowitz & Eiger, New York City, Warren E. White, Columbia, TN, for Defendant–Appellant.

Before CUDAHY, MANION, and ROVNER, Circuit Judges.

MANION, Circuit Judge.

Jack Pribble was associated with the First National Bank of Georgetown ("FNBG"), Illinois since 1965, and became its president in the early 1970's. In 1982, bank regulators from the Office of the Comptroller of Currency ("OCC") investigated FNBG regarding loans involving Pribble. The regulators had traced the proceeds of loans "involving" Pribble and found that he had applied the money for purposes other than those for which the funds had been borrowed. The regulators

criticized Pribble because he had personally used and benefitted from these loan proceeds. They told the bank's board of directors and Pribble that he should have disclosed that the loans were for his benefit, as well as revealed that he was involved in business with the individuals for whom the loans were secured. The regulators made it clear to Pribble (and the bank's board) that his actions had violated the banking laws.

In 1986, a bank holding company, First Prairie Bank, took over FNBG; Pribble, who owned 54% of the stock, became president and chief executive officer of First Prairie. In March 1990, the OCC and the Federal Reserve Bank in Chicago began another regulatory examination of FNBG. The bank examiners concluded again that Pribble had made false statements to FNBG concerning loans, misapplied funds obtained from FNBG loans, and failed to report his interest in the loans. This time a grand jury indicted him. The government charged that Pribble provided inaccurate information to secure the loans and that he improperly used the proceeds for his benefit and that of businesses he owned, all in violation of federal banking regulations. A jury convicted Pribble of bank fraud, misapplication of bank funds, and making false statements to financial institutions. Pribble seeks reversal of these convictions, or at least a new trial, contending that the jury was misinstructed, the evidence was insufficient to convict him, and that relevant evidence was mistakenly excluded from trial. We affirm.

## I.

The government's evidence against Pribble involved a series of loan transactions from 1988 through mid–1990. Also at issue are statements of Pribble's related business interests, and his financial statements on file with FNBG as its majority shareholder. One of the grounds on which Pribble seeks a reversal is the sufficiency of the evidence to convict him. For purposes of that argument, we review the trial record in the light most favorable to the prosecution. *See United States v. Meadows,* 91 F.3d 851, 854–55 (7th Cir.1996).

*$20,000 Slade Loan*

In September 1988, FNBG made a $20,000 unsecured loan to Robert Slade. The stated purpose of the loan was as a business expense. According to FNBG's president, Frank Cornwell (who is Pribble's first cousin), Pribble asked FNBG vice president Jack Morrison to prepare a $20,000 note to Slade. Pribble said that he planned to meet with Slade and if Slade's financial statement was in order, Pribble would have Slade sign the note. Pribble then left the bank with the unsigned note. Several days later, Pribble returned to FNBG with the signed note and a financial statement for Slade. Pribble falsely stated that the loan had been approved (by the bank through Morrison) and directed Cornwell to prepare a $20,000 money order payable to Slade. Pribble then left the bank with the money order.

The terms of the note required payment of principal and interest on the date the note matured in March 1989. According to Cornwell, Pribble also handled an extension on the note. When the loan was not paid on its due date, Pribble told Cornwell that "there was a Robert Slade Jr. and Sr. and he must have talked with the wrong one." In May 1989, the extension agreement (to September 1989) appeared at FNBG and contained Slade's signature. Included with the extension was a check for payment of the outstanding interest signed by Richard Schendel (Pribble's co-defendant in this case in the district court). Cornwell became suspicious and contacted Palmer American National Bank. He learned that the loan proceeds had been deposited into a bank account of Schendel's.

After the note became delinquent in September 1989, Cornwell contacted Slade. Initially, Slade denied signing the note. According to Slade, Schendel approached him and asked him to co-sign a loan from FNBG for funds to start a tanning and toning salon in Chicago. Schendel said he had reached his borrowing limit and offered Slade $2,000 if he would co-sign a note. Schendel said he would pay the note off in 90 days, and Slade was given an unsigned $20,000 note from FNBG. Slade admitted that he eventually signed the note. Slade also gave Schendel a

financial statement he had recently prepared for Schendel to submit to FNBG. The next thing Slade heard about the loan was when FNBG sent him a letter in May 1989 that the note was overdue. When that happened Pribble approached Slade and told him that if he did not renew the note, Schendel might go to jail. Pribble told Slade that Schendel had some money coming in soon and that if Slade signed the renewal everything would be okay. Slade refused.

Later, when Slade reviewed copies of the note and renewal, he found that the signature on the original note was his, but that the signature on the renewal was not. Slade never saw the money order in the amount of $20,000 payable to him, and indicated that the endorsement was a forgery. By January 1990, the loan had not been paid and was put into collection.

*Montgomery Loan with $10,000 Downpayment*

In January 1988, Pribble met with Robert Montgomery at Schendel's residence. There Pribble pitched to Montgomery a business proposition: Montgomery would become the monetary backing for a tanning and toning salon in Champaign, Illinois. Pribble had a purchase order already filled out, a description of the equipment, layout of a floor plan, and a prospectus on the possibility of making money. Pribble had the financing forms with him which indicated that the business needed $109,000, including a $10,000 downpayment. When Montgomery told Pribble he did not have that amount of cash for a downpayment, Pribble responded that he should not worry, that the money could be secured through FNBG. According to Schendel's girlfriend, who was present at the meeting, Pribble repeatedly referred to FNBG as his "little gold mine in Georgetown," although she does not recall whether he made that specific statement at that meeting.

FNBG made the loan to Montgomery. The loan documents indicated that Montgomery had made a $10,000 downpayment. At his counsel's advice, Montgomery eventually stopped paying on the loan when he discovered fraud was involved. FNBG's records in-

dicate that the bank lost $86,928.73 on the loan.

*Pribble's $7,000 Loan*

The OCC examination also revealed that in March 1990, Pribble borrowed $7,000 from FNBG in an unsecured note. The note stated that the funds were to be used to purchase a pickup truck and to pay for vacation expenses. The OCC traced the note's proceeds and found that Pribble used them for monthly loan payments at other financial institutions and to pay insurance and utility bills. The remainder was taken out in cash. Bank management could not confirm that Pribble went on vacation or ever purchased a pickup truck.

The examination also revealed that Pribble had not disclosed all of his liabilities on a financial statement he submitted to FNBG in association with this note. The financial statement failed to include three other loans totaling approximately $64,000. Also, Pribble was required to maintain a statement with FNBG listing his related business interests. In that statement, Pribble failed to tell the bank of his ownership interest in Omnishape 2000, a tanning and toning salon in Peoria.

*Financial Statement to Renew $59,000 Palmer Loan*

In July 1990, Pribble submitted to Palmer American National Bank a financial statement for the purpose of renewing a $59,000 note. He included several false statements, including an inflated salary. He also failed to list a $12,875 retail installment contract and a property lease for his tanning and toning business. The statement also falsely listed the use of the proceeds from the March 1990 $7,000 unsecured loan.

*$6,000 Mahan Loan*

In November 1988, FNBG made a $6,000 loan to Jerry Mahan, former manager of the Peoria Omnishape 2000 in which Pribble held an interest. The note matured in March 1989 and was extended to October 1989. The loan proceeds were deposited into a bank account of Omnishape 2000 over which Pribble and Mahan exercised authority. The loan was secured by a car Mahan owned. As of the OCC examination, the loan was five months overdue.

FNBG vice president Morrison told the OCC that Pribble had sent Mahan to FNBG and told Morrison to loan Mahan $6,000 for an exercise business in Peoria. The loan file contained an incomplete credit application and did not include Mahan's financial statement. A November 1988 credit report showed that Mahan had a poor credit history, and FNBG did not perform a credit analysis before extending the loan. In October 1989, Mahan wrote FNBG informing the bank of Pribble's interest in Omnishape 2000 and that the $6,000 was used for that business. Mahan suggested that FNBG take the collateral in satisfaction of the debt. Two years later, FNBG sold the car for $2,500.

*Indictment*

The second bank regulatory examination led to a criminal investigation and then a six-count indictment of Pribble. Counts 1 and 2 charged him with violating 18 U.S.C. §§ 1014 & 656 for causing FNBG to make a loan in the name of Robert Slade when he knew the proceeds would go to another party. Count 3 charged him with violating § 1014 for causing FNBG to make a loan based on a false representation that Montgomery had made a downpayment which Pribble knew had not been made. Count 4 charged Pribble with execution of a scheme to defraud the bank of his honest services in violation of 18 U.S.C. § 1344(1). Count 5 charged another violation of § 1014 for submitting a false financial statement to the Palmer bank. Count 6 charged misapplication of funds under § 656 for failing to reveal that he, through Omnishape, would benefit from the loan he arranged for Mahan. A jury convicted Pribble on all six counts. The district court sentenced him to 21 months in prison and one year of supervised release, fined him $25,000, and ordered him to pay restitution of $39,596.04, as well as a special assessment of $300. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

**II.**

Pribble seeks reversal of his convictions, or at least a new trial, on three grounds: (1) the

district court failed to charge the jury on the element of materiality on the false statement to a financial institution (18 U.S.C. § 1014) and bank fraud (18 U.S.C. § 1344(1)) counts; (2) the government presented insufficient evidence on each of the elements of the counts on which he was convicted; and (3) he should have been allowed to admit portions of certain documents from a previous examination of FNBG by federal regulators to rebut the government's Fed.R.Evid. 404(b) trial evidence.

### A. Materiality As An Element of 18 U.S.C. §§ 1014 & 1344

The materiality of any alleged falsehood is important to Pribble's defense. At the time of these transactions, he had a large net worth. At trial, Pribble contested the variations between the information he provided and the truth. He argued they were so minor that FNBG would have made these loans even had they known of these discrepancies.

▇ As Pribble acknowledges, pursuant to the Supreme Court's decision in *United States v. Wells* (issued after briefing but before oral argument in this case), materiality of falsehood is not an element of the crime of knowingly making a false statement to a federally insured bank under 18 U.S.C. § 1014. —— U.S. ——, —— – ——, 117 S.Ct. 921, 926–31, 137 L.Ed.2d 107 (1997). Thus, his argument that the jury was improperly instructed on that crime, charged in Counts 1, 3, and 5, is unsuccessful. Pribble submits, however, that the same conclusion should not be reached for 18 U.S.C. § 1344(1), bank fraud,[1] charged in Count 4. His conviction on that count should be reversed, he contends, because the district court erroneously failed to instruct the jury that materiality is an element of that crime. Here, Pribble relies on *United States v. Davis*, 989 F.2d 244, 247 (7th Cir.1993), in which this court read materiality into what is now 18 U.S.C. § 1344(2).

▇ After *Wells*, whether materiality is an element of 18 U.S.C. § 1344(1), and whether *Davis* remains good law, are questions we need not reach now.[2] Assuming materiality of a falsehood remains an element of the crime of bank fraud, the government contends the court's instructions sufficiently placed the concept before the jury. "In assessing a challenge to the jury instructions in a criminal case, we consider the instructions as a whole; we will not overturn a conviction for instructional error so long as the instructions treat the contested issues fairly and adequately." *United States v. Yarbough*, 55 F.3d 280, 284 (7th Cir.1995).

By "materiality" we mean " 'ha[ving] a natural tendency to influence, or [being] capable of influencing, the decision of the decision-making body to which it was addressed.' " *Wells*, —— U.S. at —— & n. 7, 117 S.Ct. at 926 & n. 7, quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988); *see also United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). This court recently explained materiality in the context of a "scheme to defraud." In *United States v. Coffman*, 94 F.3d 330 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1426, 137 L.Ed.2d 535 (1997), the defendants were convicted of attempting to induce stockbrokers to lend them $300,000 with fraudulent representations regarding their assets and the prospects of the borrower and others. The defendants' misrepresentations primarily involved grossly exaggerating their wealth; they asserted that these statements could not have influenced a brokerage company in deciding whether to lend them money. *Id.* at 333. They thought they should receive "a new trial because the jury wasn't instructed that their misrepresentations, to be culpable, had to be material." *Id.* at 335. In contrasting the crime of a false statement under 18 U.S.C. § 1014 with wire fraud,[3] this court elaborated on materiality:

---

1. "Whoever knowingly executes or attempts, a scheme or artifice—(1) to defraud a financial institution; ... shall be fined ... or imprisoned...."

2. The Ninth Circuit in *United States v. Nash*, 115 F.3d 1431 (9th Cir.1997), concluded that the materiality requirement for 18 U.S.C. § 1344(2) survives *Wells*. *Id.* at 1435.

3. The defendant in *Coffman* had violated 18

[W]hereas the statutory term "false statement" contains no hint of materiality, so that the jury has to be instructed separately on that element, the term "fraud" embodies the concept of materiality. Fraud is a *material* misrepresentation or omission, in the sense of one relevant to the decision that the perpetrator of the fraud wants his intended victim to make.... An instruction in the language of the statute adequately puts the issue before the jury and allows the defendant's lawyer to argue in his closing statement that there was no scheme to defraud because the misrepresentation concerned a matter that was irrelevant to the decision of the purported victim to deal with the defendant.

94 F.3d at 335 (emphasis in original).

In this case, the district court instructed the jury on the bank fraud count in pertinent part:

To prove the offense of executing or attempting to execute a scheme to defraud [FNBG] as charged in Count 4, the government has the burden of proving each of the following propositions beyond a reasonable doubt:

\*     \*     \*     \*     \*     \*

Second, that the defendant executed or attempted to execute the scheme to defraud described in Count 4 by knowingly providing one or more of the false statements described in Count 4 as summarized for you in these instructions; and

Third, that the defendant acted with the intent to deceive the bank in order to gain a financial advantage for himself or deprive the bank of his honest services.

[Tr. 828–29] The district court instructed that "a scheme to defraud" was:

some plan or course of action intended to deceive another and to deprive another of honest services or of something of value by means of false pretenses or representations. False representations can arise not only through affirmative representations but also through concealment of facts.

[Tr. 813] Also, it told the jury that "intent to defraud" meant:

the acts charged were done knowingly with the intent to deceive the officers and board of directors of the [FNBG] in order to cause a financial gain to the defendant or to deprive the bank of his honest services.

[Tr. 814]

The district court's instructions to the jury track the relevant statutory language. The bank fraud statute under which Pribble was indicted prohibits knowingly executing or attempting to execute a scheme or artifice to defraud a financial institution. 18 U.S.C. § 1344(1). The jury was instructed that the second element they had to find to convict Pribble on this count was that he executed or attempted to execute a scheme or artifice to defraud by knowingly providing false statements. Title 18 U.S.C. § 1346 defines "scheme or artifice to defraud" to "include[ ] a scheme or artifice to deprive another of the intangible right of honest services." The jury was instructed that the third element they had to find to convict Pribble on this count was that he acted with intent to deceive the bank to gain a financial advantage for himself or deprive the bank of his honest services. The court's instructions on "scheme to defraud" and "intent to defraud" contain the same requirement. Further, the instructions required the jury to find that the statements made and information withheld were calculated to deceive FNBG. The "intent to defraud" instruction says so expressly, and in his theory of defense, presented as part of the instructions, Pribble avers explicitly that he did not intend to deceive or to defraud the bank. "An instruction in the language of the statute adequately puts the issue before the jury...." *Coffman*, 94 F.3d at 335. Accordingly, the instructions would seem to adequately place the question of materiality before the jury.

U.S.C. § 1343, which forbids the use of the telephone or other modes of transmission by wire for the purpose of executing a "scheme or artifice to defraud." Section 1344(1) proscribes "a scheme or artifice—(1) to defraud a financial institution." "Congress modeled this statute, 18

U.S.C. § 1344, on the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and intended that it be construed broadly." *United States v. Hammen*, 977 F.2d 379, 382 (7th Cir.1992) (citation omitted).

This conclusion becomes clearer when we examine Pribble's defense and his closing argument on this count. In *Coffman*, we emphasized the importance of the term "fraud" in the instructions because it embodies the concept of materiality. 94 F.3d at 335. When the jury instructions repeatedly invoked that term, and defined "scheme to defraud" and "intent to defraud" using the elements of falsity and purpose, they fairly and adequately covered the idea that the statements or actions had to be capable of influencing the decisionmaker. This allowed Pribble's counsel to make the closing argument that he did on Count 4: he conceded that Pribble had not revealed his related interests and thus had violated the banking regulations, but he argued that Pribble had not committed a crime because he did not intend to deceive and gain a financial advantage. This is the same defense which this court stated in *Coffman* could be made in a jury argument from an instruction without an express definition of materiality. 94 F.3d at 335. When these instructions are viewed as a whole, the district court's failure to expressly define "materiality" did not prevent Pribble from raising his theory of defense and arguing this point vociferously. Indeed, Pribble made the most of this opportunity; the jury did not accept his theory of defense, however. "We find each of these instructions to have accurately presented the jury with the fundamental questions bearing upon the defendant's guilt or innocence of the charged offense[ ]." *United States v. Haddon*, 927 F.2d 942, 951 (7th Cir.1991).

### B. Sufficiency Of The Evidence

Pribble challenges the sufficiency of the evidence the government introduced on each of the six counts at his trial. "He follows in the footsteps of countless criminal defendants who have made similar arguments in this court, and, like them, he bears a 'heavy burden,' and faces a 'nearly insurmountable hurdle.' " *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.1996) (citations omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996).

When a criminal defendant has moved for a judgment of acquittal at the close of the government's case and renewed that motion at the close of all the evidence (as Pribble did here) or within seven days of the verdict pursuant to Fed.R.Crim.P. 29, he has preserved an appellate challenge to the sufficiency of the evidence. *Meadows*, 91 F.3d at 854–55. "In reviewing a sufficiency of the evidence challenge that has been preserved below, the question is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.*, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). "We will not reweigh the evidence or invade the jury's province of assessing credibility, and we will overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Crowder*, 36 F.3d 691, 695 (7th Cir.1994) (internal quotations and citations omitted).

#### 1. Counts 1 & 2

In these counts, Pribble and Schendel were charged with making false statements to FNBG to cause the $20,000 Slade loan to be made and then misapplying the loaned funds. Pribble contends that Slade had every right to give the loan proceeds to Schendel if he wished, and that Slade need not have revealed that Schendel would be the actual recipient of the loan proceeds. No false statement was made, Pribble asserts: Slade was the borrower, and Slade's intention to give the money to Schendel does not make false the representation that Slade was the borrower. Pribble argues that FNBG was not defrauded since Slade remained responsible for the loan. From Pribble's perspective, Schendel was acting as Slade's agent in arranging the loan.

The evidence inculpating Pribble on these counts is not overwhelming, but it is enough. Pribble showcases Slade's intent during the loan process: apparently, Slade was aware that another party or parties would benefit from the loan. Pribble's defense is weakened by Slade's own testimony that he never

knew that the bank issued the loan, he never received the $2,000 in exchange for his signature, and his signature on the check, his financial statement, and the loan extension all were forged. More importantly, Pribble's intent, not Slade's, is at issue. The jury heard circumstantial evidence from which it could rationally conclude that Pribble assisted Schendel to deliberately mislead FNBG, and that Pribble knew Schendel (and the tanning and toning business) would benefit from the loan. FNBG's president Frank Cornwell testified that at the time of the Slade loan Schendel was on the problem loan list and was ineligible for any future loans. Nevertheless, Pribble was able to funnel the money to Schendel through the Slade note. Although Pribble was the chairman of the bank holding company, and thus did not handle loans, he directed a loan officer to complete a promissory note, removed that note from the bank (returning it later), and falsely stated that the loan had been approved. Later, Pribble directed the bank president to complete a $20,000 money order—something Cornwell did not recall doing for Pribble at any other time—which was cashed the same day. Although he was supposedly the loan recipient, Slade never saw the money and never endorsed the check, which Pribble had removed from the bank. Instead, the proceeds went directly into Schendel's bank account on which a $15,000 check was drawn (which Schendel's account had insufficient funds to cover without the deposit) to pay for rent on a business which Schendel owned called "Tan and Tone." Pribble had a close association with Schendel in this type of business. For example, although Schendel had a poor loan repayment history, Pribble jointly signed a note for $9,000 to be used to add tanning and toning beds to Schendel's girlfriend's business. Slade testified that Pribble pressured him to sign an extension on the loan or Schendel "would go to jail."

From all of these facts, a rational jury could conclude that notwithstanding his duty to FNBG, Pribble deceived his bank. If nothing else, given that the bank would not have extended any credit to Schendel, Pribble's false statement that the loan had been approved caused FNBG to do something it would not have done otherwise. Further, the proceeds of the $20,000 loan Pribble took from FNBG were misapplied and ended up benefitting the tanning and toning business. From this, the jury could determine that Pribble assisted Schendel to deliberately mislead Slade and the bank to secure these funds to be used in this business venture, one in which Pribble had suggested the bank get involved, and from which his partner would profit.

### 2. Count 3

█ Robert Montgomery and MA–JAC Enterprises entered into a retail sales agreement as part of a tanning and toning business venture in which Montgomery was a general partner along with Schendel and Schendel's girlfriend. In what is termed an indirect loan, FNBG bought that agreement from MA–JAC. The agreement and an accompanying purchase order indicated a $10,000 downpayment on the sale of the business. The government charged Pribble with submitting the purchase order to FNBG with the material false statement that the downpayment was made. Pribble argues that there is no evidence that the downpayment was not made or that he made any false statement regarding the downpayment, or that he submitted any false statement to FNBG. He asserts there is no basis upon which a reasonable juror could have concluded that Pribble made any statement to the bank regarding this transaction, much less a false one.

Again, the evidence against Pribble on this count is not substantial. But likewise, the testimony of the individual in whose name the loan was secured, and the fact that the funds ended up in the tanning and toning business, incriminate Pribble. It is undisputed that Pribble was the prime mover in securing this loan. From the testimony, the jury could find that Pribble hand-wrote on the purchase order "10,000" in the Truth In Lending Act disclosures section relating to downpayments. The document suggests, in handwriting identified as Pribble's, that Montgomery made such a cash downpayment. Pribble had sufficient banking experience to know that his bank would rely on this statement. Even Pribble admitted that bank

officers would read the document to indicate that a $10,000 downpayment was being made on the loan. The loan document itemizes the amount financed. The jury could hold Pribble to the standard of an experienced banker, who would know the difference, in the downpayment portion of the loan document, between a cash downpayment and some other type of credit to be subtracted from the purchase price.

Pribble brought the purchase order to the meeting, and transferred the information from one document to the other. Montgomery clearly recalled that at the meeting he "explained to Jack that I did not have $10,000 in cash for a downpayment, and he said that wouldn't be necessary, the bank loan would only be for $99,450." Schendel's girlfriend, who was present at the meeting, testified by affidavit and confirmed at trial that "Pribble told [Montgomery] he didn't need the $10,000 and that the total loan, which would be processed through [FNBG], would be only for $99,450." As an officer of FNBG, Pribble had a duty to protect his bank: to not let its officers rely on inaccurate documents and false statements when approving a loan. From this evidence, the jury could conclude that Pribble filled out a document that showed a false $10,000 downpayment and allowed it to be sent to FNBG without explaining to the bank what that entry meant.

*3. Count 4*

■ This count relates to two statements of interest and a disclosure form completed in connection with a $7,000 personal loan to Pribble, all of which Pribble submitted to FNBG. The government charged that Pribble failed to reveal an ownership interest in Omnishape 2000, and that by making false statements on this loan, Pribble defrauded the bank of his honest services. Pribble argues that it would be absurd that he would intentionally make such a minor omission given his reported net worth of $1.6 million.[4]

Because to him the omissions in the financial statement could not affect the outcome of the loan application, Pribble sees no evidence of intent to mislead or defraud.

■ A conviction for bank fraud under 18 U.S.C. § 1344 requires proof that the defendant acted "willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Moede*, 48 F.3d 238, 241 (7th Cir.1995). FNBG was required to keep on file a financial statement any time a loan was made to one of its officers. Notwithstanding 28 years of banking experience, Pribble's financial statement did not include three loans totaling almost $64,000 from Harris, Palmer, and South Side banks. Pribble wrote on the statement that he had a loan at the First National Bank of Peoria, but no such loan ever existed; this by a banker with special familiarity with financial institutions. On March 17, 1990, Pribble secured from his bank a $1,151 money order to make the monthly payment on the loan at South Side bank. Two days later he filled out the financial statement, but failed to record that that loan existed. Pribble also filed two statements of related interest for FNBG which failed to list Omnishape 2000. He also used some of the $7,000 in loan funds to make a payment on the Omnishape loan. All of this occurred even though the OCC had warned Pribble in 1982 of the necessity to complete all documents accurately. A rational jury could conclude that it was not coincidental that the information Pribble omitted related to a tanning and toning venture, the same business which caused the problems with other loans in the indictment. These facts, viewed from the prosecution's perspective, allowed the jury to convict on Count 4.

*4. Counts 5 & 6*

Pribble is also charged with fraudulently obtaining a loan from Palmer American Na-

---

4. It is noteworthy that Pribble's $1.6 million net worth includes his stock in First Prairie Bank, which he valued at $1.5 million. It is also notable that the FDIC has a strict reporting requirement for credit secured by bank stock for an executive bank officer. *See* 12 C.F.R. § 215.12.

Because he owned more than 25% of the Bank's stock, any loan to him or a business owned by him would be subject to more stringent scrutiny and regulations; thus non-disclosure would be significant. *See generally* 12 C.F.R. § 215.

tional Bank by failing to disclose all of his liabilities and obligations, falsely stating his salary, and misstating the use to which he had put $7,000 borrowed from Georgetown. The government also advances that Pribble caused the $6,000 loan to Mahan to be made for use in the establishment of Omnishape 2000 in which he had an interest, and that he concealed that interest and any benefits to himself from the loan. Again, Pribble argues a lack of evidence of intent to defraud. Given $455,000 in liabilities, Pribble says the omission of the $12,875 loan and property lease are *de minimis*. As for the Mahan loan, Pribble asserts that his only involvement was calling Morrison to tell him that Mahan was coming to the bank to apply for the loan, and that Morrison admitted that Mahan qualified for the loan on his own merit.

■ As to Count 5, before April 1990, Pribble's salary was $80,000 per year (plus $12,000 per year for travel and entertainment expenses and $900 per month for a company car). As of April 23, 1990, the Federal Reserve told FNBG to cease Pribble's salary because it could find no justification for it. At a May 1990 meeting with the Federal Reserve, Pribble tried to have that decision reversed. When Pribble submitted his financial statement to the Palmer bank on July 2, 1990, he stated that his salary was $80,000. Pribble maintains that although the salary was cut off, the Federal Reserve still could have approved the board's request to reinstate it. Nevertheless, the jury could have found this technically untrue, as Pribble admitted he understood his salary had ceased, and the holding company had to seek permission to pay that salary, but never had. Regardless, Pribble never listed the Harris bank loan on that statement as a liability. And apparently the jury found no honest explanation for Pribble's statement that he would use the $7,000 to buy a pickup truck and for vacation expenses when the government had traced that money and found that Pribble spent 67% of it to pay bills and loans with other banks. The jury could conclude from this evidence that Pribble had made false statements on the loan application in violation of § 1014.

■ On Count 6, Pribble denied that he had anything to do with the Peoria Omnishape 2000. But the jury disbelieved this denial when the prosecution presented a document Pribble had signed stating that he owned the store. The jury could conclude that Pribble benefitted from the Mahan loan. Its proceeds benefitted Omnishape, which Pribble owned in part. Regulations required Pribble to reveal this relationship to FNBG, but he did not. Further, the loan's collateral was insufficient. Pribble knew, or should have known, that it was illegal for him to conceal the fact that an undercollateralized loan would benefit him or his business interests, as that had been the subject of a previous bank regulatory examination.

### 5. Summary

As the government argued to the jury, an experienced banker can make only so many mistakes before the omissions and misstatements borne out in the documentary and testimonial evidence will no longer be considered accidental. This rings especially true when the mistakes accrue to his benefit, or to that of a close business associate. Pribble asserts strenuously that the government failed to prove he intended to make these false statements or defraud FNBG. Yet after reviewing the evidence at trial in the light most favorable to the prosecution, circumstantial and direct evidence allowed a rational jury to find intent beyond a reasonable doubt for each of the crimes charged. *See Meadows*, 91 F.3d at 854.

### C. Rule 404(b) Evidence

■ Pre-trial, the government indicated its intent to introduce evidence of three loans covered by the 1982 OCC examination of FNBG and Pribble. That motion described the loans in detail and argued that pursuant to Fed.R.Evid. 404(b), bank examiner Vincent Van Nevel's statements concerning the 1982 examination were admissible to show Pribble's knowledge of the banking regulations and his intent. The trial court allowed Van Nevel to testify concerning his review of the loans and his discussions of them with Pribble, as well as to describe his discussions with FNBG's board of directors and with

Pribble that the loans violated certain banking regulations. Notably, the government did not introduce any written orders or documents from the OCC to FNBG or to Pribble.

In the defendant's case, during Pribble's direct examination, he sought to introduce portions of two written responses (Pribble's and the bank's) to the examiner's report. Initially, the trial judge determined that if Pribble wished to present these documents, he could do so, but that this would open the door for the government to use the three criticized loans beyond the limited purposes of Rule 404(b). Pribble chose not to open that door, and withdrew his offer of proof. Later, the court ruled that the documents were hearsay and excluded them on that ground. At that point, Pribble in effect made an offer of proof as to the evidence he sought to admit by seeking inclusion of the documents in the record as exhibits denied admission.[5] We review the district court's rulings for abuse of discretion.[6]

Pribble argues that the jury was left with a misleading impression that he and the bank accepted Van Nevel's view of the 1982 allegations, and thus that they were true. To Pribble, he should have been allowed to admit portions of the documents on this critical point to make it clear that he and the bank did not share Van Nevel's conclusions as to what the banking laws required or proscribed. He asserts that his responsive evidence also went to state of mind and knowledge, and thus should have been admitted under the rule of completeness. *See United States v. Haddad,* 10 F.3d 1252, 1259 (7th Cir.1993). The government responds that the evidence Pribble sought to introduce was not relevant to the issue of knowledge and intent, and that the explanatory documents were hearsay.

After the district judge told Pribble's counsel that if the documents came in they would be admissible for purposes beyond Rule 404(b), the offer of proof was withdrawn. Pribble's counsel's strategic choice was not necessarily a bad one. At sidebar, the government noted that Pribble had made statements to an FBI agent which contradicted statements in the documents. The government warned that if Pribble introduced these documents, it would use his statements to the FBI to prove the falsity of the statements in the documents. Pribble's counsel's choice here perhaps saved an embarrassing impeachment.

When later, Pribble sought inclusion of the documents in the record, we can conclude that he joined issue with the district court's previous evidentiary decision. Still, the court was not incorrect to conclude that Pribble's side of the story as to the 1982 OCC investigation was irrelevant to whether Pribble had been informed of certain banking regulations that governed any personal benefit he received from loans and his duty to reveal that benefit to the bank's board of directors. It was on that limited basis that the district court admitted Van Nevel's testimony. We cannot say that the district court erred when it concluded the documents Pribble sought to introduce were not relevant to Pribble's knowledge and intent, but instead were Pribble's attempt to explain the 1982 allegations of improprieties—to "rebut on the merits."

For that same reason, the district court's later ruling that the documents were hearsay is not incorrect, either. Pribble proffered

---

**5.** The government argues that Pribble failed to object when the court ruled that his exhibits were hearsay, that this objection thus has been waived, and that only if the ruling was plain error could Pribble be entitled to reversal. Although the government is correct that the defendant remained silent when the trial judge found Pribble's responses to the OCC to be hearsay, the district court appears to have viewed the objection as properly raised and preserved, as "the substance of the evidence was made known to the court by offer," Fed.R.Evid. 103(a)(2). Accordingly, this argument was properly preserved.

**6.** We decline Pribble's suggestion to review the district court's ruling on this issue *de novo* as a legal error rather than for abuse of discretion as we do other evidentiary rulings. Although "a district court by definition abuses its discretion when it makes an error of law," *Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996), that case established the standard of review for a district court's discretionary departure from the Sentencing Guidelines. Pribble alleges error in the evidentiary ruling, to which we owe deference. *See United States v. Moore,* 115 F.3d 1348, 1354 (7th Cir. 1997).

them for the truth of the matters they asserted: to tell his side of the story on the 1982 OCC investigation. The district court's ruling prevented evidence originally admitted for a limited purpose from being used for a broader argument of deliberate wrongdoing in 1982, a tangent the trial need not have traveled down (and by strategic choice, Pribble did not want to travel down), given the narrow purpose for which the evidence was admitted originally. The district court was well within its discretion to admit Van Nevel's testimony under Rule 404(b) for the stated limited purposes, and to exclude Pribble's rebuttal on the same ground.

## III.

The evidence at trial demonstrated that the loans at issue were not made in the normal course of business or to help the community. Pribble disguised them to deceive FNBG and other observers, for the proceeds directly or indirectly benefitted him or his business associate. His reference to FNBG as "his own little gold mine" undercuts his argument that he had no criminal intent.

The jury instructions on bank fraud fairly and adequately covered the element of materiality. Viewing the evidence in the light most favorable to the government, Pribble grossly abused his position as a bank officer. And the trial court did not abuse its discretion by admitting evidence concerning the 1982 OCC examination as to Pribble's knowledge and intent, but excluding Pribble's reaction to the merits of those comments as irrelevant. For these reasons, Pribble's convictions are

AFFIRMED.