In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1187

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOEL RIVERA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:17-cr-00057-PP-2 — **Pamela Pepper**, *Judge.*

ARGUED AUGUST 7, 2018 — DECIDED AUGUST 27, 2018

Before KANNE, SCUDDER, and ST. EVE, *Circuit Judges.*

PER CURIAM. A jury convicted Joel Rivera of aiding and
abetting a pair of Hobbs Act robberies and his friend's use of
a firearm during them. The same jury, however, acquitted
him of, or deadlocked on, counts related to three other rob-
beries. Rivera moved for a judgment of acquittal on the four
counts of conviction, arguing that the evidence was insuffi-
cient to show that he knew in advance that his friend, Anto-
nio Thomas, would commit the armed robberies or to show

that he assisted Thomas during them. Alternatively, he asked for a new trial on the ground that the jury should have disregarded Thomas's testimony—the key evidence at trial—because Thomas was an unbelievable witness and the remaining evidence was too weak to support the convictions. Because the evidence was sufficient and the district judge reasonably concluded that concerns about Thomas's credibility did not warrant a new trial, we affirm the judgment.

## I. Background

After robbing five Milwaukee businesses in early 2017 over a brief two-week period, Rivera and Thomas were charged with five counts of Hobbs Act robbery, *see* 18 U.S.C. § 1951(a), and five counts of brandishing a firearm during a crime of violence, *see id.* § 924(c)(1)(A)(ii). Their paths then diverged. Rivera opted for a jury trial, while Thomas pleaded guilty and testified in exchange for leniency.

We review the evidence presented at Rivera's trial with a focus on Thomas's testimony. Rivera met Thomas, who was homeless at the time, in December 2016 and offered to let him stay at the apartment that Rivera shared with his girlfriend, Emily Zayas. Although Rivera told the police that he did not know Thomas well, Zayas testified that the pair frequently spent time together. Indeed, the call records for Thomas's cell phone showed multiple calls made between his phone and Zayas and Rivera's shared cell phone, including some immediately before and after the robberies.

### A. The First Three Robberies: Two Taquerias and a Subway Restaurant

On January 4, 2017, Rivera drove Thomas to Taqueria Los Gallos in a silver Honda Odyssey van. Rivera

then gave Thomas "a book bag" with clothes to wear and a .9 mm pistol to use to rob the restaurant. Thomas, unmasked, went in alone and got the cash. He met Rivera back in the car, and they split the money.

The next day Rivera drove to Taqueria Aranda in the same van, which was captured on the restaurant's surveillance video. As the pair discussed, Rivera went in first, posing as a customer. He was followed by Thomas, face covered, and armed with the same pistol as the day before. Rivera, still pretending to be a customer, laid on the ground and urged the staff in Spanish to do the same to avoid being shot. Thomas proceeded to get cash from a worker and left. Rivera returned to the car a couple minutes later. Again, the pair took equal shares of the $600 proceeds.

On January 9, they robbed a Subway. Rivera again drove and went inside first. Rivera made eye contact with Thomas when he entered the restaurant, a signal for Thomas to go ahead with the robbery, and then "watch[ed] the front door" for him during it. The surveillance video shows Rivera inside the restaurant. After robbing the store, Thomas escaped through the back door. The two met up in an alley, went back to the car, and ultimately split the $700 cash.

## B. 13th Street Family Dollar Store Robbery

Two days later, the duo robbed a Family Dollar store on 13th Street. Like before, Rivera drove. This time, though, Thomas said that the robbery was "spontaneous" and he did not remember discussing details. Rivera went in first, then Thomas followed after "put[ting] on the equipment that he gave me, the book bag" and with the same gun in hand that

Rivera gave him. Thomas successfully demanded money using the gun before he fled. Rivera met him at the van a couple minutes later, and they divided the $300 cash. Thomas did not see Rivera during the robbery, but Thomas said that he assumed that Rivera had been "keeping" customers at the back of the store. The surveillance video shows Rivera wandering the aisles and making a hand gesture toward customers at the back of the store as he exits after the robbery.

### C. Hampton Street Family Dollar Store Robbery

The last robbery took place a week later. Rivera drove to a different Family Dollar store, located on Hampton Street, with Thomas and Zayas. Thomas testified that "the robbery was planned," and Zayas was going to "steal some stuff" with Thomas going in to rob the store after her. Rivera stayed in the van; Zayas entered the store first, followed by Thomas, who was wearing the same clothes as he had for the earlier Family Dollar store robbery and carrying the same gun. Thomas pointed the gun at two workers and demanded money, while Zayas snagged a comforter and left. From the cash register, a clerk gave Thomas dollar bills, some of which had a tracker inside. As the trio pulled away, they heard approaching police sirens, and Zayas figured out that a tracker was hidden in the cash. She tossed the tracker out of the van window, and they ditched the police. The flight path of the van was captured on video by a surveillance camera. Thomas and Rivera again split the robbery proceeds, and Thomas returned the gun to Rivera.

Zayas testified in exchange for dismissal of her then-pending charges. She said that Rivera drove them to the Family Dollar store in the van to "buy a comforter," but she left the store once she saw Thomas robbing it. As they fled, Zayas

said that "a hysterical argument" erupted between the two men about why Thomas unexpectedly robbed the store, and Rivera tried to kick Thomas out of the car. After the robbery, Zayas testified that she kicked Thomas out of her and Rivera's apartment. In an interview with police officers, Rivera gave a different story about the Hampton Street robbery: only he and Zayas went there together, he waited in the car, and when she returned she told him that a robbery was happening.

An anonymous tip led the police to Thomas, and he was arrested two days after the robbery of the Hampton Street store. Thomas eventually confessed and in the process also identified Rivera and Zayas as his accomplices. The police went to arrest Rivera at his apartment, but he denied them entry before officers arrived with a signed warrant. In the meantime he hurriedly burned items in his bathroom.

The jury also heard testimony that cast doubt on Thomas's credibility. An officer testified that Thomas had falsely accused his arresting officers of sexual assault. Thomas himself acknowledged that he had trouble controlling his behavior, had heard voices and seen "things that weren't there," and had heavily used marijuana and cocaine until his arrest. He also explained that he hoped to gain leniency for testifying but had not been promised anything. Thomas admitted that he had been "lying the whole time" to the police before he decided to cooperate, once he "figured out that [he] was going to do all these years in prison." Initially, he had told the police that Rivera had forced him to commit the robberies by kidnapping him and threatening to kill his sister and brother. Finally, Thomas got upset when Rivera's counsel pressed him about Rivera's involvement in the robberies. At first Thomas

said that Rivera was a necessary participant because he supplied the van and that they split the proceeds equally because of that and because Rivera had given him "a place to stay." He later backtracked, however, contending that Rivera had pointed a gun at his head and essentially threatened him into helping with the robberies. At that point Thomas became so flustered on the stand that the judge called a recess.

At the close of the government's case and the trial's end, Rivera moved for a judgment of acquittal on all counts. The court denied the motion both times. The jury then returned a split verdict: it found Rivera not guilty on both counts for the Taqueria Los Gallos robbery and on the firearm count for the Taqueria Aranda robbery; it could not reach a verdict on the robbery count for the Taqueria Aranda robbery or on both counts for the Subway robbery; and it found him guilty on the four counts for the two Family Dollar store robberies and found that a firearm was brandished during both of them.

After the verdicts, Rivera again moved for a judgment of acquittal, *see* FED. R. CRIM. P. 29(c), and also for a new trial, *see* FED. R. CRIM. P. 33, on the four counts of conviction. Thomas's testimony, he emphasized, was insufficient to establish his knowledge that the robberies or firearm use would occur or that he did anything to facilitate them. Rivera argued that the evidence showed only his "[m]ere presence" and "[a]ssociation" with Thomas, neither of which sufficed to convict him. As for his new-trial motion, Rivera urged the court to "discount" Thomas's testimony because of his lies to the police, contradictory trial testimony, and "meltdown" during cross examination.

The district judge denied Rivera's motion for a new trial, concluding that, although Thomas was "untruthful" at times,

he could be partially credited. Rejecting Rivera's arguments to set aside Thomas's testimony, she gave four reasons: (1) the jury observed Thomas and knew about his "mental health problems"; (2) his demeanor at trial, including his "meltdown," did not necessarily mean that he was lying; (3) he had admitted that he lied to the police; and (4) his testimony was largely corroborated by other evidence—specifically, the surveillance footage that supported Thomas's testimony that Rivera was present, as well as Zayas's testimony about the last robbery that mostly matched Thomas's account.

As for the motion for a judgment of acquittal, the judge determined that the evidence was sufficient on all counts, pointing primarily to the sheer unlikelihood that Rivera was present for the multiple robberies by accident. She observed that even if Rivera did not know Thomas's exact plans for the last two robberies, he knew that Thomas would rob the stores and use a gun, as he had before. She added that Rivera had "a pattern of conduct" during the robberies—he went inside first and kept an eye on Thomas. Finally, the judge pointed to several circumstantial pieces of evidence that, with the other evidence, supported his guilt: (1) the hand gesture captured on video at the 13th Street robbery; (2) the calls between Thomas's and Rivera's phones; (3) Thomas's presence at Rivera's home and their use of marijuana together; and (4) Rivera's rush to burn things before the police arrived with an arrest warrant at his home.

The district judge sentenced Rivera to 432 months' imprisonment total—48 months for the robbery counts consecutive to the required minimums of 84 months for the first firearm count and 300 months for the second. In calculating the guideline range, she twice declined to rely on Thomas's testimony

when it was uncorroborated: (1) she did not apply a 2-level increase for physical restraint based on Thomas's belief that Rivera held customers at the back of the first Family Dollar store; and (2) she did not include the Taqueria Los Gallos robbery as relevant conduct because no video evidence linked Rivera to it. With the Taqueria Aranda and Subway robberies, however, she concluded that the videos supported Thomas's testimony that Rivera participated in the robberies.

## II. Analysis

On appeal Rivera challenges the decisions on his motion for judgment of acquittal and motion for a new trial.

### A.  Rule 29(c) Motion for Judgment of Acquittal

We review de novo a ruling on a motion for judgment of acquittal. *United States v. Conley*, 875 F.3d 391, 397 (7th Cir. 2017). We will not "reweigh the evidence or invade the jury's province of assessing credibility," and will overturn the verdict only if "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016) (quoting *United States v. Pribble*, 127 F.3d 583, 590 (7th Cir. 1997)).

Rivera maintains that the evidence was insufficient to convict him as an aider and abettor of the two Family Dollar store robberies and of the firearm use for those robberies. Aiding and abetting requires that a person both (1) act in furtherance of the offense (2) with the intent to help the offense's commission. *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014). As for the firearm counts, a person also must know in advance that a gun will be used. *Id.* at 1249.

### 1. 13th Street Family Dollar
### Store Robbery

Rivera contends that the evidence established only that he went with Thomas to the 13th Street Family Dollar store and was inside when that robbery happened. He emphasizes that Thomas characterized the robbery as "spontaneous," that Thomas prepared for it only after Rivera went into the store, and that Rivera could not see Thomas from his location in the store. His discussion, though, highlights the evidence that was favorable to him and ignores the rest.

Thomas's testimony alone sufficed to establish Rivera's guilt on both the robbery and firearm counts for the robbery at the 13th Street Family Dollar store: he testified that Rivera drove to and from the store, that they agreed beforehand that Rivera would keep customers at the back of the store, that Thomas used the clothing and the gun that "he gave me" (the "he" referring to Rivera), and that the pair split the money afterwards. From that testimony, the jury could have concluded that Rivera intended to aid Thomas in robbing the store at gunpoint, that he assisted the robbery by providing the gun and clothing and by driving to and from the store, and that he knew in advance that the gun would be used. Because we conclude that the jury could have decided that Rivera aided the robbery either by outfitting Thomas or by driving, we need not address Rivera's argument that the evidence was too thin to support a conclusion that he facilitated the robbery by "keeping" customers at the back of the store.

Moreover, Rivera wrongly faults the district judge for thinking that, in light of the three previous robberies, it was unlikely that he was a mere bystander at the 13th Street Family Dollar store. The jury did not need to look at the evidence

for each robbery "in isolation from the others"; it could consider evidence of Rivera's actions during the other robberies to infer reasonably that Rivera participated in the robbery at the 13th Street Family Dollar store. *United States v. Betts-Gaston*, 860 F.3d 525, 533 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 689 (2018). That evidence, including Thomas's testimony about the three other robberies and the surveillance video that placed Rivera at two of them, made a coincidental encounter or even a spontaneous robbery seem highly unlikely. For the third consecutive robbery, an identical pattern ensued: Rivera entered first; Thomas followed; Rivera stayed inside while Thomas robbed the location; Thomas used the same gun to demand money; and Rivera left shortly after Thomas.

### 2. Hampton Street Family Dollar Store Robbery

As to the last robbery at the Hampton Street Family Dollar store, Rivera unpersuasively contends that the evidence was even thinner because Thomas did not testify about a plan to rob the store (only that Zayas was going to steal household goods) or that Rivera knew about that plan. First, Rivera overlooks that Thomas testified during cross examination (albeit somewhat imprecisely) that the robbery was "planned," and that the plan included both Zayas stealing merchandise and Thomas robbing the store. Although Rivera responds that any notion of a preplanned robbery is undercut by Zayas's testimony that a "hysterical argument" erupted after the robbery, the jury instead could have credited Thomas's account that did not include any quarrel in describing the same getaway and that characterized the robbery as "planned."

Even if the jury did not believe that there was an explicit robbery plan, the jury could have concluded nonetheless that Rivera knew that Thomas would rob the store and assisted it

anyway. By the time of the robbery at the Hampton Street Family Dollar store, Rivera had been present for *four* recent others. He points out that this last robbery did not precisely match the "pattern of conduct" that the district judge identified, because Rivera never went inside the store, as he had for three of the prior robberies. But, on the whole, the evidence sufficed for the jury to determine that the robbery was similar enough to the other recent robberies that Rivera's presence was not a mere coincidence: Rivera drove to and from the store; Thomas wore the same clothes and carried the same gun that Rivera had given him for the other robberies; Thomas and Rivera again split the proceeds; and this time Zayas fulfilled Rivera's role as the innocent customer.

Furthermore, police officers testified that Rivera initially lied about knowing Thomas and said only he and Zayas had driven to the Hampton Street Family Dollar store together. The jury was entitled to conclude that these lies, especially when coupled with Rivera's hurry to burn items in his bathroom after he denied police entry into his home, evinced Rivera's guilt. *See United States v. Mbaye*, 827 F.3d 617, 620 (7th Cir. 2016).

We turn now to the firearm count for this robbery, which requires that Rivera knew in advance that Thomas would use a gun in the robbery. Although this count presents a closer question, we conclude that the evidence—which was largely circumstantial—still was sufficient to support Rivera's conviction. *See United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) ("A verdict may be rational even if it relies solely on circumstantial evidence."). As Rivera points out, Thomas's testimony about this last robbery was less clear than for the others—he did not explicitly testify that Rivera gave him the gun

before he went inside or that they agreed to an armed robbery. As we just described, however, the robbery of the Hampton Street Family Dollar store had many similarities to the other armed robberies that took place over a short two-week period that Thomas testified he and Rivera agreed to, making it increasingly doubtful that Thomas decided to commit another armed robbery without involving Rivera. Moreover, Thomas testified that he used the same gun in each robbery, that the gun was Rivera's, and that after each robbery—including the last—he returned the gun to Rivera. These facts supported an inference that Rivera did supply Thomas with the gun or knew Thomas had it *before* he entered the store.

What is more, the jury's split verdict reflects its willingness to consider carefully the evidence on each count. *See United States v. Davis*, 724 F.3d 949, 956–57 (7th Cir. 2013). This is not a case in which we are concerned that the jury convicted Rivera on the four counts for the two robberies solely because they found the evidence impossible to parse and evaluate on a count-for-count basis.

## B. Rule 33 Motion for New Trial

In considering a motion for a new trial, a district judge may assess the credibility of the witnesses and "may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *Conley*, 875 F.3d at 399. "[B]ecause the district court judge is best positioned to make this determination," our review for abuse of discretion is "highly deferential." *Id.*

Rivera argues that a new trial is necessary because Thomas's testimony is "incredible," and he raises two particular challenges to the judge's decision. At the outset, Rivera

criticizes the judge for engaging in a piecemeal analysis of Thomas's testimony instead of considering his lies and contradictions as a whole to determine if they "left a strong doubt" about Rivera's guilt. But Rivera himself lists seven parts of Thomas's testimony that, he says, demonstrates Thomas's "unreliability," so it is unclear why he faults the district judge for analyzing Thomas's testimony in a similar fashion. Moreover, to the extent that the judge commented on specific parts of Thomas's testimony, she was responding to Rivera's arguments. She, for example, concluded that Thomas had a "meltdown" as a result not of lying, but rather of being frustrated with counsel's questions. She also thought it significant that Thomas admitted that he had lied to the police and explained why. Those conclusions were only part of her eventual determination that Thomas's testimony could be partially credited.

Rivera also challenges the district judge's reasoning as insufficient because she did not review the evidence to see if it corroborated the details of Thomas's testimony necessary to convict him. Yet the judge did address evidence she viewed as bolstering Thomas's testimony, pointing primarily to Zayas's testimony and the surveillance videos. As we described when discussing the sufficiency of the evidence, the other evidence of collaboration between Rivera and Thomas was ample.

With this in mind, the judge said enough to establish that she agreed with the jury's decision to credit portions of Thomas's testimony. She addressed Rivera's arguments and explained her reasons for still thinking Thomas was telling

the truth in enough respects. We cannot say that her decision to deny the motion for a new trial was unreasonable.

AFFIRMED