In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-3442

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TRACY CONLEY,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-CR-00779 — **Sharon Johnson Coleman**, *Judge.*

---

ARGUED SEPTEMBER 15, 2017 — DECIDED NOVEMBER 14, 2017

---

Before MANION, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* Tracy Conley was ensnared in a now familiar government set up in which a government actor, pretending to be a criminal, presents the defendant with an opportunity to be part of a robbery of an illegal drug stash house. The stash house is fictional, of course, and so the government decides which and what quantity of drugs it will have (in this case, fifty kilograms of cocaine) and how high or low the barriers to the crime will be (in this case it

was allegedly protected only by two armed and one un-armed guards). Conley took the bait and ended up with a sentence of 180 months' imprisonment on drug distribution and weapons charges. He moved the district court for acquittal or a new trial and when that was denied, appealed the decision to this court. We affirm.

**I.**

Conley arrived at his workplace on November 1, 2011, only to find that he could not work because of a malfunctioning piece of machinery. He started to drive back to his girlfriend's house, but in a second stroke of bad luck, found that he did not have enough gas or money to purchase gas for the trip. While stopped at the gas station, Conley encountered two acquaintances, David Flowers (David) and Anwar Trapp (Trapp).[1] According to the evidence taken in the light most favorable to the government, as we must after conviction by a jury (*United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2008)), David and Trapp picked up Conley and brought him back to Anthony Adams' basement to discuss a plan to rob an illegal drug stash house, a plan orchestrated by Myreon Flowers (Myreon).

Unbeknownst to Conley, Myreon, or anyone else in the basement meeting, there was no robbery to be had. It was, instead, a sting set up by the Federal Bureau of Investigation (FBI) and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Earlier, on October 25, 26, and 31, an FBI cooperating source and an ATF undercover agent met with Myreon to discuss and plan a stash house robbery. The un-

---

[1] David and Myreon Flowers were related and had the same surname, therefore we refer to each by his first name.

dercover agent, posing as the disgruntled employee of drug kingpin, gave Myreon the tip that a drug-king boss had a stash house where there would be at least fifty kilograms of cocaine guarded by one unarmed and two armed men. Myreon developed a plan involving at least three armed robbers who would tie up the stash house guards and steal the cocaine.

On October 31, Myreon met with his brother, David, and his cousin, Trapp, at a friend's apartment and told them about the opportunity to rob the stash house. The three men discussed recruiting Adams because he had a gun. The next day, November 1, Trapp, David, and Myreon found Adams and discussed plans with him in the basement of his house. Cell phone records confirmed calls between Adams and David at this time.

Trapp testified that in that basement meeting Myreon explained to Adams that "he had this one white guy that got a lick [robbery] for them to go on for fifty kilos of coke." A. 0202.[2] After some discussion of the robbery plan and the need for more participants, Adams said that he had someone in mind who could help, and he, David and Trapp left Adams' house to pick up the defendant who was a few blocks away.[3] Prior to this point, Conley was not involved in the conspiracy.

---

[2] References are to the defendant-appellant's short appendix filed in this court.

[3] The government's brief implies that Conley was at his house which was only a few blocks away from Adam's residence. Conley maintains that he met them at a gas station. Whether Conley was at his house or at a gas station does not affect the resolution of this case.

According to Trapp, he, Myreon, David, Adams, and Conley then reunited, again in Adams' basement, to discuss the robbery. Conley, of course, had a different version of the story—one that involved smoking marijuana and discussing some work gutting a house. But once again, on a motion for acquittal or new trial, we take the facts in the light most favorable to the government, which in this case come largely from the testimony of co-conspirator Trapp and corroborated in many instances by other evidence and testimony. At this final basement meeting, Myreon passed along what he had learned from "the white guy"—that the fifty kilos were being stored in a garage guarded by three Mexicans, two of whom had guns. Trapp understood that Adams and Conley would be the ones "that actually do the robbery." A. 0208. The group decided that they needed one more robber and one more gun to carry out their plan.

In response to their questions, Myreon told Adams and Conley that they would get two to three kilograms of cocaine apiece for assisting with the robbery. Trapp also testified that Adams and Conley wanted to know how Myreon knew the white guy, whether he could be trusted, and what was going to happen to him after the robbery—that is whether "we gonna leave him alone or we gon [sic] pop [shoot] him." A. 0210. Myreon said that nothing would happen to "the white guy." The group then agreed to meet at 6317 S. Mozart in a few hours before dispersing.

Trapp testified that following that meeting, he and David dropped Conley off where they had picked him up. Trapp then called his cousin, Dwayne Jones, and asked to meet him at 6317 S. Mozart because "it [was] about to go down." A. 0212. Trapp and Jones both testified that they then met with

David and Myreon at that address and that the four of them (Conley was not present) discussed the robbery, including the fact that others would also be involved.

Based on their plan, the four men (not including Conley) drove to a nearby Lowe's hardware store to procure supplies for the robbery, including a walkie-talkie set to communicate with each other during the robbery, and blue latex gloves to ensure that they did not leave fingerprints behind. Jones testified that during the drive back to Mozart Street, he and Myreon had a disagreement about the fact that the latter had told the men who would actually be executing the robbing that they would each only get two kilograms of cocaine. Jones did not think that was fair as those were the three individuals who would be assuming the greatest risk by going into the garage to get the drugs. Myreon, however, said that the men had already agreed to the amount.

The undercover FBI agent arrived at 6317 S. Mozart at around 1:45 pm and recorded the conversations. From approximately 1:45 until 2:30 p.m., Myreon, David, Trapp, Jones and the agent discussed plans for the robbery while waiting for Conley, Adams, and a third man, Rudy Space, to arrive. As Myreon explained to the agent, earlier that morning he had met with these individuals who were going to actually execute the robbery, and had discussed the possibility of having to shoot the armed guards. According to the recording, David obtained a gun from inside the house and Trapp hid it inside of Myreon's white work van.

Eventually, Conley, Adams, and Space arrived at the house on Mozart Street. Adams retrieved an item (the government surmises that it was likely a gun) out of his trunk and then followed Conley and Space into the white work

truck. Photographs of the interior of the van showed that it was full of tools and equipment with little space for three adult men to sit.

Trapp testified, and surveillance data confirmed, that after the three men entered the white work van, Trapp obtained a silver gun from a man named Woody. Trapp wrapped the gun in his sweatshirt and handed it to Myreon who was sitting in the driver's seat of the white work van. Myreon took the gun and returned the sweatshirt. A photograph of the toolbox in which the gun was later deposited showed that the silver gun ended up at the bottom of the box, beneath two other guns, neither of which was silver. The government uses this as evidence that someone (but we do not know who) moved the guns around while they were in the back of the work van, and surmises therefore that anyone in the cramped van would have seen and thus had knowledge of the guns.

Myreon drove the van with the undercover agent, Adams, Space, and Conley to meet up with others at a gas station and then drove to a nearby forest preserve where Myreon announced that Adams, Conley, and Space would get out of the work van and into another van to head to the location of the stash house. The surveillance video showed Adams, Conley, and Space exiting the work van and immediately entering the undercover agents' van.

Almost immediately thereafter, the agent gave the arrest signal and Conley and the other co-conspirators were taken into custody. As the arresting officer approached Conley, the latter removed the blue surgical gloves that he had been wearing and discarded them and then started crawling away from the van.

After the arrests, law enforcement officers found the walkie-talkies and a toolbox containing three loaded guns. Conley's fingerprints were not found on any of the guns or the toolbox. During Conley's post-arrest interview he admitted that he went to the house on Mozart with Adams and Space, but stated that he had put on the blue surgical gloves as a joke and that they were driven to a forest preserve where someone handed him a tool case. The interviewing officer stated that Conley got angry and agitated when questioned about the toolbox.

The government charged Conley with (1) conspiracy to possess with intent to distribute more than five kilograms of a controlled substance, in violation of 21 U.S.C. § 841(a)(1); (2) attempt of the latter; (3) possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924 (c)(1)(A); and (4) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). A jury found Conley guilty on all counts. Conley moved for post-trial relief seeking a judgment of acquittal or a new trial under Fed. R. Crim. P. 29 and 33, respectively. Conley's claims, which he repeats here, were that there was insufficient evidence to convict him beyond a reasonable doubt, and that Trapp's testimony was unreliable and should not have been credited for the purposes of establishing the elements of the offense. At the district court's request, the parties also briefed the application of this court's then-recent decision in *United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014), regarding the defense of entrapment. The district court, clearly distressed by the government's false stash house set up and by the thin amount of evidence supporting Conley's convictions, nevertheless concluded that under the standard for acquittal after a jury verdict or for a new trial, there was sufficient evidence

to support the convictions and that none of the alleged errors warranted a new trial.

The district court sentenced Conley to 180 months' imprisonment—120 months on the conspiracy, attempt and felon-in-possession convictions, to run concurrently, and 60 months of imprisonment on the conviction for possession of a firearm in furtherance of a drug trafficking offense, to be served consecutively, as required by statute. Conley's co-conspirators, all of whom entered into plea agreements, received between 46 and 104 months, the latter for Myreon, the ringleader of the conspiracy. Jones and Trapp testified against Conley under a plea deal in which they were each promised a dramatically reduced sentence in return for their testimony.

## II.

We review the district court's denial of a motion for acquittal de novo, taking the evidence in the light most favorable to the government, and granting the motion only where no rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Betts-Gaston*, 860 F.3d 525, 533 (7th Cir. 2017). If there is a reasonable basis in the record for the verdict, it must stand. *United States v. Moshiri*, 858 F.3d 1077, 1082 (7th Cir. 2017).

### A.    *The conspiracy charges.*

Conley argues that the government failed to meet its burden of establishing sufficient evidence to support his conviction on the conspiracy charges and thus the district court erred by denying his post-trial motion for acquittal. To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government had to prove the existence of

a conspiracy to possess with intent to distribute a controlled substance and that Conley knowingly or intentionally became part of the agreement. *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014); *United States v. Mire*, 725 F.3d 665, 678 (7th Cir. 2013). Similarly, to sustain a conviction for attempt, the government had to prove that Conley intended to possess cocaine with the intent to distribute it and knowingly took a substantial step toward that goal. *United States v. Fiedeke*, 384 F.3d 407, 411–12 (7th Cir. 2004).

Although it is true that there were no smoking guns with Tracy Conley's name on them in this trial, the government set forth sufficient evidence for a jury to conclude that Conley participated in the conspiracy. The strongest parcel of evidence came from Trapp's testimony about the November 1, 2011 strategy and planning meeting before the attempted crime. Trapp testified that on that date, the conspirators, including Conley, met in a basement to discuss the robbery. According to Trapp's testimony, Myreon told the men about his encounter with the man who tipped him off about a Mexican cartel's stash house filled with 50 kilograms of cocaine. Myreon conveyed that three men (two of them armed) would be guarding the drugs. The group together decided that they would need another person, Space, to safely carry out the robbery. Trapp testified that he understood that Conley, Adams, and the other "guy" (Space) were "gon [sic] be the one[s] that actually do the robbery." A. 0208. Trapp testified that the group together decided that they needed more guns as one would not be enough. Trapp also testified that "Conley and [Adams] wanted to know like how did Myreon met this guy and do we trust him, what's gon [sic] happen with him after everything is finished … what we gon [sic] do to him, like if we gonna leave him alone or we gon [sic] pop

[shoot] him." A. 0210 Just as with Shakespeare's Rosencrantz and Guildenstern, the storyline does not make explicitly clear which conspirator, Conley or Adams, made which statement. Trapp's testimony, however, was that both Conley and Adams were asking questions about Myreon's source of information and that both were present for the discussion of the need for a gun and deliberations about whether the government agent would be killed. Although it is true that it would have been stronger evidence of Conley's participation if we knew that he had been a vocal participant in the planning. Nevertheless, Trapp's testimony clearly established that Conley was part of the conversation and understood what was being said and the nature of the plan. It does not much matter which words came from him and which from his co-conspirators provided that he knew of the existence of the conspiracy, knowingly or intentionally agreed to become part of it, and took a substantial step toward that goal by entering the van and donning the gloves. The evidence is sufficient to show that he did.

Trapp was, of course, a convicted felon and testifying under a plea deal that would greatly reduce his potential prison sentence, but the jury was entitled to credit his testimony and we cannot say that no reasonable jury could have done so. Much of his testimony was corroborated by other evidence or testimony. For example, Jones testified that he heard about the same basement meeting from Myreon and David; phone cell site records corroborated Trapp's testimony about the location of various conspirators at the times he had specified. And those same records corroborated his reports of contacts between conspirators, and other records corroborated the addresses of various defendants and their locations as described by Trapp. In addition, after being ar-

rested, Conley himself admitted to having been present at the basement meeting (although he claims they discussed a cleaning or construction job). The government also had a recording from November 1, 2011 in which Myreon described the basement meeting and in which other conspirators referred to the roles of their co-conspirators, including Conley.

Moreover, the jury had more than just Conley's mere presence with the conspirators upon which to convict. They had Conley's own movements and words which added evidence to the mix. Conley got into the work van, donned latex gloves, and then transferred to the next van which was supposed to take him to the stash site. He also confessed to law enforcement that he had attended the November 1 basement meeting. See *United States v. Johnson-Dix*, 54 F.3d 1295, 1302 (7th Cir. 1995) ("when acts in furtherance of the conspiracy were committed, a defendant's presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy, is sufficient to establish the participatory link.")

Circumstantial evidence, standing alone, can suffice to support a conspiracy conviction. *United States v. Goree*, 756 F.3d 522, 525 (7th Cir. 2014). And in this case it supported Trapp's testimony. In other words, we cannot say that there was no evidence from which a reasonable juror could have found Conley guilty of joining the conspiracy to possess with intent to distribute a controlled substance. And for all the reasons that the evidence was sufficient to support a jury verdict for conspiracy, it also supported a jury finding of attempt.

In addition to moving for acquittal, Conley also asked the district court for a new trial pursuant to Federal Rule of

Criminal Procedure 33. That rule provides that a trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). This court reviews a district court's denial of a motion for a new trial under Rule 33 for an abuse of discretion. *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016). A new trial is warranted "where the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand." *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989). As the district court recognized, in such a motion, a court may properly consider the credibility of the witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice. *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). Because the district court judge is best positioned to make this determination, our review is highly deferential, recognizing that "the exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (citing *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990), *amended* 910 F.2d 467 (7th Cir. 1990)).

Conley's motions for acquittal and for a new trial are based on the same claims, that the government failed to prove the elements of the offenses beyond a reasonable doubt—in other words that the verdict was against the weight of the evidence. It is true that the district court could consider Trapp's credibility while considering his motion for a new trial, and the district court noted just that. *United States v. Conley*, No. 11-CR-779-6, 2015 WL 394012, at *4 (N.D. Ill. Jan. 29, 2015). Conley appears to argue that the district court did not properly consider Trapp's credibility under the standard for a new trial. The district court set forth

the proper standard and determined that there was sufficient evidence to support the conviction. There was no need for the district court to engage in a second end-to-end review of the same evidence that it used in determining sufficiency under the motion to acquit.

Overturning the jury's determination on Trapp's credibility would require the district court to make the exacting and rare determination that his testimony was incredible as a matter of law. *United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001). Such a determination is usually reserved for extreme situations wherein, for example, "it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all." *Id.* Under ordinary circumstances, a defendant who has received a reduced sentence in exchange for his testimony does not present such an extreme situation, particularly when, as was the case here, the jury was informed of the agreement and could weigh the implications of it along with credibility. A finder of fact is entitled to believe the testimony of even the most dishonest of witnesses. *United States v. Algee*, 309 F.3d 1011, 1016 (7th Cir. 2002). After all, just as a broken clock is correct twice a day, a lying felon might also speak the truth at times. In sum, this was not one of those rare instances in which the evidence was so speculative that justice demanded a new trial. See e.g., *Peterson*, 823 F. 3d at 1122.

## B.     *The firearms charges.*

In addition to returning a finding of guilt on the conspiracy charges, the jury also found Conley guilty both of possessing a firearm in furtherance of a drug trafficking crime and of being a felon in possession of a weapon. As with the

conspiracy charges, Conley argues that the government failed to meet its burden of establishing sufficient evidence to support his conviction on these charges. In order to convict Conley for possessing the firearm during a drug crime, the government had to prove beyond a reasonable doubt that the defendant possessed a gun and used it in relation to a drug offense. 18 U.S.C. § 924(c); *United States v. Duran*, 407 F.3d 828, 840 (7th Cir. 2005). Possession of a weapon may be actual or constructive where the latter "may be established by demonstrating that the defendant knowingly had the power and intention to exercise dominion and control over the [gun], either directly or through others, thus establishing a nexus between himself and the [gun]." *United States v. Jones*, 872 F.3d 483, 489 (7th Cir. 2017), citing *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009).

We agree with the district court that the evidence of actual or constructive possession was meager. The government presented no evidence that Conley handled any weapons. His fingerprints did not appear on any firearms or the toolbox. The government argues instead that the guns went into the toolbox in a certain order but were in a different order when the police seized them, indicating that they had been moved around in the back of a crowded van in which three grown men, including Conley, were squeezed one on top of another. If the guns had been moved, the government implies, Conley must have seen them. They support this implication with Conley's agitated behavior when questioned about the toolbox. This is a drop of circumstantial evidence indeed, but not more. More convincing is the government's argument that Conley was present for the discussion of the stash house raid which included a description of the armed guards who were expected to be protecting the stash, and

the consequential need for firearms. As the government said in closing and argues in its brief, "You can't bring a knife to a gunfight." (Brief of the United States at 27). But that is proof that Conley participated in a conspiracy in which firearms were used. It is not evidence that Conley possessed, either actually or constructively, a firearm. And if the basis for Conley's conviction on this count is his participation in a drug conspiracy in which firearms were used, that kind of guilt can be proved through the *Pinkerton* theory of liability.

Under a *Pinkerton* theory of liability, a defendant is liable for the criminal conduct of co-conspirators where those criminal acts (1) were reasonably foreseeable to the defendants; and (2) occurred during the time that they were members of the conspiracy. *United States v. Cruse*, 805 F.3d 795, 817 (7th Cir. 2015), *cert. denied sub nom. McClain v. United States*, 136 S. Ct. 1699 (2016), citing *Pinkerton v. United States,* 328 U.S. 640, 647–48 (1946). In this case, the use of firearms was an essential part of the plan, it was within the conspiracy's scope, and therefore foreseeable to Conley. And because Conley joined the conspiracy, he is accountable for his confederates' foreseeable acts. See *United States v. Adams*, 789 F.3d 713, 714 (7th Cir. 2015).

Trapp testified that Conley was present at the meeting where the co-conspirators outlined the plan for the robbery, including a discussion of the fact that two of the stash house guards would be armed, and that therefore they would need firearms (and more than the one to which they then had access). According to Trapp's testimony, Conley was also actively involved in a discussion in which some members of the group discussed whether the man who brought them the information would be killed or not. For all of the reasons

outlined above, Conley was a part of the conspiracy. As a member of the conspiracy, therefore, Conley can be held accountable for the foreseeable use of the firearm in furtherance of a drug trafficking crime. He could also be found guilty as an aider and abettor, under the theory that even if he did not bring the gun to the drug deal himself, he took part in the plan knowing (beforehand—that is, with time enough to withdraw) that a confederate would do so. See *Rosemond v. United States*, 134 S. Ct. 1240, 1249 (2014).

As for the felon-in-possession charge, the government was required to demonstrate that (1) Conley had a prior felony conviction, (2) that he possessed a firearm, and (3) that the firearm travelled in or affected interstate commerce. *United States v. Sewell*, 780 F.3d 839, 847 (7th Cir. 2015). Conley disputed only the possession prong. Although there was for a time some confusion as to whether, in this Circuit, *Pinkerton* liability could be applied to a felon-in-possession charge, (see *United States v. McLee*, 436 F.3d 751, 758 n.3 (7th Cir. 2006); *United States v. Walls*, 225 F.3d 858, 864–66 (7th Cir. 2000)), our decision in *United States v. Newman*, ended that uncertainty, at least for the facts as presented this case. See *Id.*, 755 F.3d 543, 546 (7th Cir. 2014). Conley had a felony conviction, he participated in the joint criminal activity, promoted its objective, and knew that confederates had guns. See *Id.* Under both the theory of shared culpability of conspirators under *Pinkerton* and that for aiding and abetting under *Rosemond*, Conley is liable for being a felon in possession of a weapon.

## C.      *Entrapment.*

This leaves only Conley's claim of entrapment for discussion. The defense of entrapment, however, is inapplicable in

this case as it applies only when a government actor recruits a defendant into a conspiracy. There is no defense to entrapment by a private individual. *United States. v. Morris*, 549 F.3d 548, 551 (7th Cir. 2008). Conley's co-conspirators, and not the government, recruited him. Conley tries to make an end run around this clear precedent by claiming that he was entrapped derivatively. Derivative entrapment occurs "when a private individual, himself entrapped, acts as agent or conduit for governmental efforts at entrapment." *United States v. Hollingsworth*, 27 F.3d 1196, 1204 (7th Cir. 1994). It is a doctrine whose validity is under some debate. See, e.g., *United States v. Layeni*, 90 F.3d 514, 519 (D.C. Cir. 1996) (questioning the reasoning in *Hollingsworth*). But even were it not, the defense of derivative entrapment can only be applied to a defendant who was entrapped through a first entrapee. *Ward v. United States*, 858 F.3d 1072, 1076 (7th Cir. 2017). In this case, the ATF undercover agent recruited Myreon, the ringleader, who in turn recruited David, who recruited Adams, who recruited Conley. Conley was far too many degrees of separation from the government agent to utilize an entrapment defense. The distinction is not without reason. The government induces a crime when it solicits a crime and engages in "some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Mayfield*, 771 F.3d at 434–35. That other conduct may be "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if

left alone will do so in response to the government's efforts." *Id.* at 435. Although the government has control over its conduct when interacting with the first alleged entrappee (and might possibly if asserting direct agency over a second entrappee), the government agency cannot possibly control what types of conduct have been used to induce conduct in someone several actors down a chain.

### III.

We conclude with a word about the district court's articulated dismay with the prosecution of this stash house case. In its order, the district court questioned "the wisdom and purpose of expending the level of law enforcement resources and judicial time and effort in this prosecution." *Conley*, 2015 WL 394012 at *6. At sentencing the court stated that Conley's sentence was "devoid of [] true fairness … and will serve no real purpose other than to destroy any vestiges of respect in our legal system and law enforcement that this defendant and his community may have had." A. 0068. Specifically, the district court was dismayed that it was forced into a minimum sentence based on the government's ability to control the sentence by manipulating the amount and type of drugs that were "in" the fictitious stash house.

The district court's discomfort with this case echoes a substantial body of criticism of similar stash house cases both from this circuit and others. Beginning many years ago, we criticized these cases as "tawdry," noting in particular how these operations are "directed at unsophisticated, and perhaps desperate defendants" like Conley who easily take the all-too-tempting bait put out for them by the government. See *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011). See also *United States v. Kindle*, 698 F.3d 401, 414 (7th

Cir. 2012) (Posner, J., dissenting), *reh'g en banc granted, opinion vacated* (Jan. 16, 2013), *on reh'g en banc sub nom. United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014) (noting that fictitious stash house stings "are a disreputable tactic," and allow law enforcement to manipulate the inducements and temptations to "jack up" sentences); *United States v. Flowers*, No. 15-3988, 2017 WL 4785960, at *15 (6th Cir. Oct. 24, 2017) (Stranch, J., *concurring*) ("I find the concept of these 'stash house sting' operations at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law."); *United States v. Washington*, 869 F.3d 193, 213 (3d Cir. 2017) (reminding the government that the court has expressed misgivings in the past about the wisdom and viability of reverse stash house stings.); *id.* at 223 (McKee, J., *dissenting*) ("the potential for abuse and mischief that is endemic to fictitious stash house stings should not be ignored," and includes government manipulation of drug quantities to increase sentences, difficult questions about whether a planned stash house robbery is within a defendant's actual ambition and means, and whether such cases raise issues of racial profiling); *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010) (expressing concern about the fact that in fictitious stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs and minimize the obstacles thereby increasing sentences); *United States v. Black*, 750 F.3d 1053, 1057–58 (9th Cir. 2014) ("in this era of mass incarceration, in which we already lock up more of our population than any other nation on Earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them—people who but for the

government's scheme might not have ever entered the world of major felonies."); *United States v. McLean*, 199 F. Supp. 3d 926, 943 (E.D. Pa. 2016) (finding that enforcing a mandatory minimum in a fake stash house case would offend due process because of "the inherently arbitrary way in which stash house sting cases first ensnare suspects" and the "concentration of power that allows the Government to define both crime and punishment, with no possibility for judicial review of the facts of the individual case.").

In this case, Conley may have been starting down a straighter path, after a life filled with many poor choices. He was gainfully employed, had obtained his GED, enrolled in some college courses, and had skills in electronics and marketing. But he was also an "unsophisticated and desperate" target, so down on his luck that he did not have even enough money to get home from work on the day he was approached by his co-conspirators. See *Lewis*, 641 F.3d at 777. They folded him into the conspiracy after most of the planning had already been done by Myreon, David, and Trapp, and assigned him and the other johnny-come-latelys the dangerous job of confronting the armed guards and stealing the drugs, while the planners lingered on the periphery in relative safety. Like the district court, we "question[] the wisdom and purpose of expending the level of law enforcement resources and judicial time and effort in this prosecution." *Conley*, 2015 WL 394012 at *6. But the resources have been expended and the district court conducted an exceptionally thorough post-trial review and "[a]fter much consideration, time, reflection and review of the parties' arguments and the trial record" properly denied the motion for acquittal or new trial on all charges. See *id.* The decision of the district court is AFFIRMED.