**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 25-4075**

───────────

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

PRESTON MILLS, JR.,

        Defendant – Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Robert E. Payne, Senior District Judge.  (3:08-cr-00525-REP-1)

───────────

Argued:  March 20, 2026                           Decided:  April 20, 2026

───────────

Before GREGORY, AGEE, and BENJAMIN, Circuit Judges.

───────────

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Agee wrote the opinion, in which Judge Gregory and Judge Benjamin joined.

───────────

**ARGUED:**  Salvatore M. Mancina, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Olivia L. Norman, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Carolyn V. Grady, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Erik S. Siebert, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

───────────

AGEE, Circuit Judge:

Preston Mills, Jr., appeals the district court's revocation of his supervised release and his 24-month revocation sentence. Mills argues that the district court's finding that he violated the mandatory condition not to commit a new crime was clearly erroneous and that his revocation sentence is plainly unreasonable because the district court ignored a potentially non-frivolous mitigation argument. On review, we find no error in the district court's decision to revoke Mills' supervised release, but we agree with Mills that his revocation sentence is plainly unreasonable. Accordingly, we affirm the revocation of Mills' supervised release but vacate his sentence and remand for resentencing.

I.

Mills pleaded guilty in 2008 to conspiracy to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841, 847, and possession of a firearm in furtherance of a drug trafficking offense, in violation of 21 U.S.C. § 924(c). The district court ultimately sentenced Mills to 88 months in prison to be followed by five years of supervised release. In April 2015, Mills was released from federal custody and began his term of supervision.

Mills' probation officer filed a petition to revoke his supervised release in November 2018, alleging that Mills had violated the terms of his supervision. Among other things, the probation officer alleged that Mills violated the mandatory condition not to commit a new crime after he was charged in state court with strangulation and assault and battery of his then-girlfriend, Lakiesha Moore. While the petition was pending, the probation officer filed an addendum alleging that Mills again violated that same mandatory

2

condition based on a charge in Hanover County, Virginia, for assault and battery of his estranged wife, Cleo Mills. At a June 2019 revocation hearing, the district court revoked Mills' term of supervised release and sentenced him to 18 months in prison, followed by 36 months of supervised release.

In June 2020, Mills was again released from prison and began serving his second term of supervision. It began well: he was employed, tested negative for illicit drug use, and, by July 2021, had completed mental health counseling. But in June 2022, Mills' then-ex-girlfriend, Jessica Rodriguez, filed a report with the Stafford County, Virginia Sheriff's Office alleging that, in May 2021 (while Mills was serving his second supervised release term), he strangled and assaulted her. Based on Ms. Rodriguez's report, Mills was charged in state court with strangulation and assault and battery of a family member. Mills' probation officer learned of the charges in August 2022 at which point he filed a petition to revoke Mills' supervised release, alleging that he yet again violated the mandatory condition not to commit a new crime.[1] Shortly thereafter Mills was arrested pursuant to a warrant and was released pending a revocation hearing.

It took quite a long time for the revocation proceeding to conclude. With an eye toward having the state trial on the underlying charges completed before Mills' federal revocation hearing, the parties filed (and the district court granted) seven motions to continue the federal proceeding. Because the federal petition was not resolved until January

---

[1] The petition also alleged that Mills failed to follow his probation officer's instructions to immediately turn himself in to the Stafford County Sheriff's Office. The Government eventually dismissed this violation, and it is not at issue on appeal.

3

2025, Mills' term of supervised release—which had been set to expire on June 5, 2023—was extended until then. *See Rico v. United States*, 607 U.S. __, 2026 WL 815786, at *4 (Mar. 25, 2026) (noting that "a court's power to revoke supervised release 'extends beyond the expiration of the term of supervised release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such violation'" (quoting 18 U.S.C. § 3583(i))).

The district court heard the evidence of the alleged violations involving Ms. Rodriguez at an initial hearing in July 2024 and at several other hearings between then and January 2025. The reason for each continuance is not particularly relevant to resolving this appeal, but it's contextually useful to know that after the Government finished putting on its evidence, which included Ms. Rodriguez's testimony, the court continued the matter until Mills' state trial concluded.

Ms. Rodriguez testified at the revocation hearing that she dated Mills for nearly four years. He moved into her home after he was released from prison in 2020, but their relationship deteriorated in spring 2021 due to a conflict between Ms. Rodriguz and Mills' estranged wife, Cleo, with whom Ms. Rodriguez believed Mills was still romantically involved. On the evening of May 5, 2021, Mills became upset during an argument with Ms. Rodriguez, pulled her to the floor of their bedroom, and punched her in the head. When Ms. Rodriguez tried to get up, Mills strangled her from behind and she could not breathe. Only when Ms. Rodriguez's daughter called the police and started banging on the bedroom door did Mills stop strangling her. At that point, Mills grabbed his belongings and drove

4

away. When officers later arrived, Ms. Rodriguez said she was "fine" and that the incident was "just an argument." J.A. 114. At that time, she did not report any assault or strangulation.

Ms. Rodriguez also testified that she finally reported the incident to law enforcement in June 2022 because Mills would not leave her alone and she was nervous that he was keeping track of her. She denied that Cleo Mills was a factor in her decision to report the attack. According to Ms. Rodriguez, she changed the locks to her home the day after the fight and Mills hadn't lived there since.

After Mills was acquitted of the state charges, he sought to impeach Ms. Rodriguez's testimony with statements she made when testifying at the state trial that he claimed contradicted her prior revocation hearing testimony. The district court found that there were no inconsistences in Ms. Rodriguez's testimony and that, even if there were, any inconsistency was immaterial.

Several other witnesses also testified in the federal proceeding, including Ms. Rodriguez's daughter, Julissa Alston, who corroborated her mother's account of events; Mills' probation officer; and Cleo Mills. The Government also introduced text messages between Ms. Rodriguez and Mills from the day after the incident. In one sample exchange, Ms. Rodriguez recounted to Mills that he "slammed, punched and choked me to the point I think I need to go to the hospital[,]" to which Mills responded, "[l]ast night definitely went to [sic] far," that he was "not proud of the night at all and [] apologize[d] for things that took place[,]" and that he "completely underst[ood] where [Ms. Rodriguez was] coming from[.]" J.A. 255. Receiving no response, Mills later sent another message

5

expressing that he was "super apologetic," took "full accountability for [his] actions[,]" and went "way too far[.]" J.A. 256. Ms. Rodriguez replied the next day, again recounting her version of events:

> The last memory I will have of us together will be of you slamming me down and when I got back up you punched me twice in my head knocking me back down to the floor. I kicked you twice in your balls and in your attempt to grab my neck I grabbed you by the balls and turned around and got back up. Which you then grabbed me in a choke hold that nearly could have KILLED ME (Not at all an exaggeration for me) these events occurred unprovoked. I'm currently not able to speak much or breath [sic] at 100 and will be going to the doctors as soon as I find out what my rights are not having to report this.

J.A. 257. To that recitation, Mills responded: "Am asking u not too [sic] please bae" and "I love you bae and don't wanna split." J.A. 259–60.

Mills testified that the assault was precipitated by Ms. Rodriguez confronting him about whether he was having intimate relations with Cleo Mills. While the two were in their bedroom, Ms. Rodriguez told Mills that she wanted him to leave the home, and Mills asked her for the keys to the truck so that he could do so. Ms. Rodriguez told him "no" and stuck the keys in her pants. At that point, Mills said, "Give me my keys," and went to reach for them. J.A. 374. Ms. Rodriguez tried to fend his arms off, tripped over the ottoman "with [Mills] trying to get the keys out of her pants," and then landed on the floor. *Id.* Eventually, with Ms. Rodriguez kicking at him from the floor, Mills was "able to get [his] hand in her pants to take the keys out." J.A. 375. Mills maintained that at no time did he strangle or strike her. In response to questioning about the subsequent text messages on cross-examination, Mills testified that he was merely referring to his efforts to get the keys from Ms. Rodriguez and their argument. He explained that he had not denied Ms. Rodriguez's

6

allegations in those messages because he just wanted to apologize and move back home. According to Mills, he continued to see Ms. Rodriguez romantically after the incident and the two did not call off their relationship until early 2022.

Closing arguments followed. Mills' counsel conceded that Mills admitted to assaulting Ms. Rodriguez by trying to get the truck keys out of her pants but argued that there was insufficient evidence to show that he struck or choked her. Counsel emphasized that the timing of Ms. Rodriguez's police report, more than a year after the incident, called her credibility into question and that there was no evidence that she suffered any physical injuries on her neck. Counsel also made a brief sentencing argument, noting that Mills had been on supervised release and well-behaved for an additional 19 months since the petition had been filed. For its part, the Government argued that there was sufficient evidence that Mills strangled Ms. Rodriguez, relying heavily on the messages sent after the incident and that Mills didn't deny the accusations therein. It also highlighted that Ms. Rodriguez's version of events was corroborated by her daughter's testimony.

The district court ultimately concluded that the Government met its burden of proving by a preponderance of the evidence that Mills had violated the mandatory condition not to commit a new crime by committing both offenses, strangulation and assault and battery of a family member. The court first found Ms. Rodriguez "to be a credible witness, notwithstanding the delay in her reporting." J.A. 454–55. It then went on to note that "[t]he most compelling evidence" was the text messages between the parties the day after the incident because they were "contemporaneous expressions of what it is that happened." J.A. 455. In particular, the court highlighted one message in which Ms.

7

Rodriguez said, "[y]ou slammed, punched, and choked me to the point I think I need to go to the hospital[,]" *id.*, and that Mills responded to that statement without denying that it had occurred. The court concluded, "I believe Ms. Rodriguez, I believe her daughter. I understand [Mills'] case respecting the chronological [sic] and don't credit it. I don't credit [Mills'] testimony. I don't think he's truthful. I don't accept it as truthful, but the written record and the photographs prove his guilt."[2] J.A. 457–58.

Given the late hour, the court continued sentencing to the next week. Before recessing, however, the court noted that "the United States wishes to have the maximum punishment imposed," but that it would "need to hear from [the Government] on the effect, if any, of the fact that [Mills] has been on supervised release for 19 months more than he would have been on had this matter proceeded in a time frame different than the one that we have," because Mills had made that argument. J.A. 462.

At the beginning of the sentencing hearing, the parties agreed that, as a matter of law, the court could impose a new term of supervised release. Because the strangulation offense was a Grade A violation, Mills' Guidelines range was 37 to 46 months in prison. The Government advocated for a 36-month sentence, because in its view, the 18-month sentence imposed after Mills' first revocation for similar offenses proved insufficient. Mills argued that a sentence of home confinement was appropriate given that he was employed, providing for his six children and adhering to the conditions of his release. He also argued

---

[2] The court also concluded that Mills' admission that he tried to grab the truck keys from Ms. Rodriguez's pants and forcing her to trip over the ottoman was alone sufficient to find Mills guilty of the assault and battery on a family member charge.

that the court should credit his good conduct for the nearly five years he spent on supervised release, with "the exception of that one period of time that was not good and determined to be criminal, even though the jury found him not guilty." J.A. 758.

The district court then reviewed the factors under 18 U.S.C. § 3553(a). It explained that the violations were serious, as demonstrated by Ms. Rodriguez's corroborated testimony that Mills strangled and assaulted her. Turning to Mills' history and characteristics, the court recognized that "all of the good things that he has done in his life[,]" including his history of gainful employment and evidence indicating he is a good father who supports his children, "must augur in his favor." J.A. 760–62. But the court also found that Mills had "a propensity to assault other people, to resort to physical force, and not to respond to extensions of leniency that were given when . . . those assaults occurred." J.A. 761. To protect the public and afford adequate deterrence, the court concluded that a term of incarceration was necessary. It sentenced Mills to 24 months in prison with no term of supervision to follow.

Mills timely appealed, challenging the district court's revocation of his supervised release and subsequent sentence. We have jurisdiction under 28 U.S.C. § 1291.

II.

A.

Mills first argues that the district court abused its discretion by revoking his supervised release because the finding that he committed the crime of strangulation was clearly erroneous. We readily dispose of this argument.

9

"A district court may revoke supervised release if it 'finds by a preponderance of the evidence that the defendant violated a condition of supervised release.'" *United States v. Patterson*, 957 F.3d 426, 435 (4th Cir. 2020) (quoting 18 U.S.C. § 3583(e)(3)). This standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)). Our review of a district court's revocation of supervised release is for abuse of discretion, meaning that we review legal conclusions de novo and factual determinations for clear error. *Patterson*, 957 F.3d at 435. "Under clear-error review, our task is to determine whether the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.* (citation omitted). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

The district court did not clearly err in finding that Mills violated his supervised release based on the evidence presented and did not abuse its discretion in revoking his term of supervised release. Mills' primary argument is a nonstarter as it does no more than take issue with the district court's decision to credit Ms. Rodriguez's version of events over his. Simply put, the court did not clearly err by crediting Ms. Rodriguez's testimony. We afford "[a] district court's credibility determinations at a revocation hearing . . . a great deal of deference[.]" *Patterson*, 957 F.3d at 435. And "'when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told

10

a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never' amount to clear error." *Id.* (quoting *Anderson*, 470 U.S. at 575). "After all, overturning a credibility determination is 'usually reserved for extreme situations wherein, for example, it would have been physically impossible for the witness to observe what he described.'" *Id.* (quoting *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017)). In the end, however, "a finder of fact is entitled to believe the testimony of even the most dishonest of witnesses." *Id.* (citation omitted).

The court did not, as Mills contends, "fail[] to grapple with the evidence that undercut [Ms. Rodriguez's] credibility[,]" Opening Br. 32, nor did it "ignore[] significant discrepancies in [her] testimony," *id.* at 37. Instead, the court painstakingly tackled each of the alleged discrepancies between her federal and state court testimony and found either that there was in fact no inconsistency or that any inconsistency was immaterial. *See* J.A. 343–47. It's not our role to second guess those determinations.

As one example, Mills makes much ado about the district court's finding that Ms. Rodriguez was "a credible witness, notwithstanding the delay in her reporting[.]" J.A. 454–55. In tandem with the delay in reporting is a dispute over why Ms. Rodriguez reported Mills when she did. On this point, according to Mills, the district court should have written off Ms. Rodriguez's testimony primarily because there was an alleged inconsistency as to when she had encountered Cleo Mills in relation to filing the police report. But the

11

corroborating evidence formed more than a sufficient basis for the district court to credit Ms. Rodriguez's testimony even though she waited more than a year to report the incident.[3]

That corroborating evidence includes the text messages between Ms. Rodriguez and Mills from the day after the incident in which Ms. Rodriguez accused Mills of hitting her, knocking her down, and strangling her, and Mills apologized for those acts without any denial that they occurred. The court found these messages were the "most compelling evidence" because they were "contemporaneous expressions of what it is that happened." J.A. 455. Even more, the court heard testimony from Ms. Rodriguez's daughter, which it found confirmed Ms. Rodriguez's account that when she ran out of her bedroom, she was struggling to breathe. And the court also reviewed photos of Ms. Rodriguez's neck injuries taken shortly after the incident. *See* J.A. 457 (noting that "there's proof, photographic proof that there's some injury there"). All that to say, the district court's conclusion that Mills strangled Ms. Rodriguez is "plausible in light of the record viewed in its entirety." *Patterson*, 957 F.3d at 435 (citation omitted).

In the end, Mills has not cleared the high hurdle of demonstrating that the district court clearly erred by finding Ms. Rodriguez's testimony credible. That testimony and the host of other evidence introduced at the hearing is more than sufficient for the district court to find Mills guilty of the strangulation violation by a preponderance of the evidence. Accordingly, we hold that the district court did not abuse its discretion in revoking Mills' supervised release based on that finding.

---

[3] For the same reason, we reject Mills' reliance on the other alleged inconsistencies in Ms. Rodriguez's testimony that the district court rejected. *See, e.g.*, Opening Br. 32–36.

B.

Mills separately contends that his revocation sentence is plainly unreasonable because the district court didn't consider one of his non-frivolous mitigation arguments—that he should get some credit for the additional 19 months he spent on supervised release while the revocation petition was pending when his sentence here is determined. On this point, we agree with Mills and therefore will vacate his sentence and remand for resentencing.

When reviewing a district court's revocation sentence, we employ "a more deferential appellate posture than when reviewing original sentences to account for the unique nature of supervised release revocation sentences." *United States v. Gibbs*, 897 F.3d 199, 203 (4th Cir. 2018) (cleaned up). That is, "while original sentences are reviewed for 'reasonableness,' we have recognized that even an unreasonable revocation sentence may stand unless it is *plainly* unreasonable." *Id.* (citation omitted). Determining whether a revocation sentence is plainly unreasonable involves a two-step process. First, we determine whether the sentence is procedurally or substantively unreasonable. *Patterson*, 957 F.3d at 436. Only if the answer is "yes," will we turn "to whether the sentence is plainly unreasonable—that is, whether the unreasonableness is 'clear' or 'obvious.'" *Id.* (quoting *United States v. Crudup*, 461 F.3d 433, 439 (4th Cir. 2006)).

Mills mounts only a procedural-reasonableness challenge to his sentence, arguing that the district court failed to account for his non-frivolous mitigating argument regarding his extended supervised release period. "A revocation sentence is procedurally reasonable if the district court adequately explains the chosen sentence after considering the

13

Sentencing Guidelines' nonbinding Chapter Seven policy statements and the applicable 18 U.S.C. § 3553(a) factors." *United States v. Slappy*, 872 F.3d 202, 207 (4th Cir. 2017) (footnotes omitted). The district court's explanation "must encompass an assurance that the sentencing court considered the applicable sentencing factors with regard to the particular defendant before it and also considered any potentially meritorious arguments raised by the parties with regard to sentencing." *Gibbs*, 897 F.3d at 204 (cleaned up). Thus, "[a]lthough that is a low bar, the record must reflect some affirmation that the court considered the arguments in mitigation made by a defendant." *Patterson*, 957 F.3d at 440.

At sentencing, Mills offered a potentially meritorious mitigation argument in support of his request for a sentence of home confinement: the court should give him credit for the additional 19 months he spend on supervised release with no further violations— that is, from the time his supervision was set to expire in June 2023 until the petition on supervised release was resolved in January 2025.[4] *See* J.A. 432–34, 758. Based on our review of the record we agree with Mills that the record does not reflect that the district court adequately considered or addressed that argument when selecting his sentence. The Government agrees that the court did not expressly address this point. *See* Resp. Br. 41 (conceding that the district court did not address that argument "[i]n its explanation of the

---

[4] By our count, Mills made this argument at least twice. *See* J.A. 433 (arguing that the additional 19 months Mills spend on supervision was sufficient punishment); J.A. 758 (asking the court to give Mills "credit" for the extended period of supervision during which he had no other violations). Even the Government recognized the need for the court to address Mills' extended term of supervised release. *See* J.A. 744 (discussing "whether – or to what extent the Court could or should consider the amount of time that Mr. Mills' term of supervised release, this current term of supervised release was extended based on this – the number of continuances on this petition").

14

sentence imposed"). But the Government resists the conclusion that vacatur of the sentence and remand is necessary, maintaining that the district court adequately addressed Mills' mitigation argument during a colloquy with counsel at the beginning of the sentencing hearing. Under the facts of this case, we must disagree.

The actual discussion at the hearing was about whether it was legally permissible for the court to impose an additional term of supervised release given the extended term Mills had been serving. *See, e.g.*, J.A. 746 (District court: "So it makes the extension permissible?"). That inquiry about the court's authority is quite different from what role, if any, the extended 19-month term of supervised release should play in the district court's ultimate sentencing decision.

There is no doubt that the district court was aware that Mills spent a significant period on extended supervision beyond the expiration of his initial term of supervised release. In fact, at the first revocation hearing on August 1, 2024, the *Government* raised the "issue" that Mills had "in essence been on supervised release for an extra year." J.A. 77. And, as we just noted, the court ordered the parties to brief whether it could impose an additional term of supervision as a matter of law. So, it's certainly possible, and perhaps probable, that the district court had considered Mills' extended period of supervision when it fashioned the revocation sentence. But we must have record evidence that consideration occurred and cannot speculate for purposes of appellate review. We cannot "effectively review the reasonableness of [Mills'] sentence" without record verification that the asserted mitigation factor was considered by the district court in its sentencing decision. *Patterson*,

15

957 F.3d at 439. While some asserted mitigation arguments may be dubious, in Mills' case, the 19-month additional restraint on his liberty is not.

Without the assurance that the court in fact "*considered* [the] potentially meritorious argument[] raised by [Mills] with regard to his sentencing[,]" we must conclude that Mills' revocation sentence is procedurally unreasonable. *Patterson*, 957 F.3d at 439; *see also Slappy*, 872 F.3d at 209 ("[W]here a court entirely fails to mention a party's nonfrivolous arguments in favor of a particular sentence, or where the court fails to provide at least some reason why those arguments are unpersuasive, even the relaxed requirements for revocation sentences are not satisfied.").

Having concluded that Mills's revocation sentence is procedurally unreasonable, we move to the next step and determine whether it is plainly unreasonable, meaning that the unreasonableness is "clear" or "obvious." *Crudup*, 461 F.3d at 440. It is well-settled in the Fourth Circuit that the district court must "provide enough of an explanation to assure this Court that it considered the parties' arguments and had some basis for choosing the imposed sentence." *Slappy*, 872 F.3d at 210. In this case, we have no assurance that the district court considered Mills' potentially non-frivolous mitigation argument regarding the effect of his extended period of supervised release. Thus, the revocation sentence is clearly and obviously unreasonable such that it is plainly unreasonable. *United States v. Celedon*, 165 F.4th 873, 882 (4th Cir. 2026).

III.

Accordingly, we affirm the district court's revocation of Mills' supervised release but vacate Mills' revocation sentence and remand for resentencing consistent with this opinion. In view of Mills' projected release date of October 7, 2026, the district court should proceed on remand without delay.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*